UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES M. MURPHY,

    *Plaintiff*,

v.

DEPARTMENT OF THE AIR FORCE

    *Defendant*.

Case No. 1:17-cv-1911 (ACR)

**MEMORANDUM OPINION AND ORDER**

A Discharge Board convened by Defendant Department of the Air Force found that an Air Force physician sexually assaulted a female officer and then tried to thwart the ensuing investigation. Dkt. 89-7 at 1. A separate Peer Review Panel substantiated the woman's allegations and found that the physician breached patient trust and presented a danger to patient safety. Dkt. 89-9 at 1. The Discharge Board recommended that the Air Force discharge the physician "under other than honorable conditions," Dkt. 89-7 at 1, and the Peer Review Panel recommended that the Air Force revoke the physician's "clinical privileges," Dkt. 89-9 at 1. The Oregan State Medical Board revoked the physician's medical license. Dkt. 89-6 at 4.

With this limited information, the reader might well suppose that the woman is the plaintiff. Perhaps she has sued the Air Force, the physician's employer, on some type of tort claim. After all, at least two independent panels confirmed the sexual assault and found that the physician presents a danger to patient safety. However, it is the physician, Plaintiff James M. Murphy, who claims victimhood. He has sued the Air Force for violating his rights under the Privacy Act, 5 U.S.C. § 552a.

1

How? Before the Air Force could discharge him, Plaintiff left and obtained employment as an anesthesiologist at an Army medical center. Deducing that the Army might want to know their new doctor presented a danger to patient safety, an Air Force attorney informed the medical center of the Discharge Board's findings. Plaintiff claims that this disclosure violated the Privacy Act because the Army did not "need to know" anything about the Air Force investigations. Compl. ¶ 39. And he claims that the disclosure —and not, say, his derelict conduct and the revocation of his medical license—led the Army to fire him.

The Air Force, to no one's surprise, responds that the Army needed to know that two panels had found that its new doctor had sexually assaulted a patient and presented a danger to patient safety. It argues, moreover, that a Privacy Act violation requires an intent to violate the Act and that the Air Force attorney had no intention other than to inform the Army of a patient safety issue. Finally, the Air Force contends that the disclosure did not cause the Army to fire him. Instead, Plaintiff's conduct and ensuing consequences led to his dismissal.

The Court has no trouble agreeing that the Air Force did not violate the Privacy Act. The Court therefore **GRANTS** Defendant's Motion for Summary Judgment, Dkt. 89, and **DENIES** Plaintiff's Cross-Motion for Summary Judgment, Dkt. 106.

## I.      FACTUAL BACKGROUND

While Plaintiff denies that he performed a genital examination and contests the truth of the various investigations and board findings, *see generally* Dkt. 105-2, there is no dispute as to the facts relevant to the summary judgment motion, *see id*.

### A. Plaintiff's Service and Employment Background

Plaintiff James M. Murphy graduated from medical school in 1996 and completed a three-year residency in anesthesiology from 1999 to 2002. Compl. ¶ 13, 15. He served in the

Air Force Reserve from 2005 until 2007. Dkt. 106-3 at 1. In 2007, the Air Force Reserve assigned Plaintiff to the Oregon Air Force National Guard (ORANG) where he worked until 2016. *Id.*; Compl. ¶ 16. As part of his regular duties, Plaintiff conducted health examinations on Air Force personnel. Compl. ¶ 17.

In June 2014, after the Air Force had opened numerous investigations into his conduct, Plaintiff left Oregon, moved cross country, and obtained employment as a civilian anesthesiologist at Fort Bragg Womack Army Medical Center (Womack Medical) in North Carolina. Dkt. 89-1 at 7. First working as a contractor, Plaintiff accepted a full-time permanent position as an anesthesiologist at Womack Medical on September 8, 2015. Dkt. 106-3 at 2. In this role, Plaintiff was responsible for "[p]rovid[ing] contemporary regional and general anesthesia care including pediatric, geriatric patients; obstetric anesthesia, and anesthesia for all surgical specialties at" Womack Medical. Dkt. 89-20 at 3. Among other things, Plaintiff needed to be licensed to practice medicine and be "fully credentialed" to provide the services described above. *Id.* at 5.

On March 17, 2016, Womack Medical informed Plaintiff that it had removed him from all patient duties, and that it would discharge him from the hospital effective April 1, 2016. Compl. ¶ 29. On March 30, 2016, before his discharge, Plaintiff resigned from Womack Medical. Dkt. 89-1 at 13. On August 22, 2016, "the Air Force took official action and discharged" Plaintiff from ORANG and the Air Force Reserves. *Id.*

**B. The Unauthorized Pap Smear and Its Discovery**

On November 19, 2011, while working at ORANG, Plaintiff conducted a health examination, which included a gynecological exam, on Staff Sergeant Hannah Mosebach. Dkt. 89-1 at 5-6. In December 2013, SSgt. Mosebach learned that gynecological exams were "not a

3

part of the periodic health assessment" for which SSgt. Mosebach saw Plaintiff. Dkt. *Id.* at 6. After learning this, SSgt. Mosebach discovered that Plaintiff had not documented this exam in her medical record of the visit. *Id.* at 7. The medical technician who helped her pull the relevant file reported the unauthorized exam and Plaintiff's failure to document it to the ORANG Medical Group Commander. *Id.*

On December 8, 2013, the Medical Group Commander informed Plaintiff that ORANG planned to initiate a Command Directed Investigation into an allegation of an unauthorized gynecological exam, *i.e.*, a sexual assault. *Id.* ORANG referred the case to the Office of Complex Investigations (OCI) on January 5, 2014. Compl. ¶ 19. ORANG also opened a Quality Assurance Investigation. *Id.* ¶ 22; Dkt. 89-1 at 9.

### C. OCI Substantiates the Allegations and Quality Assurance Raises Concerns for Patient Safety

In August 2014, OCI concluded that SSgt. Mosebach's report of sexual assault was "substantiated based on a preponderance of the evidence." Dkt. 89-8 at 1. OCI based this conclusion on SSgt. Mosebach's "credibility as demonstrated in the consistency of her recitation of the sexual assault to others," "her demeanor during her interview," Plaintiff's "demeanor during his interview," various electronic communications and statements of witnesses, and "the absence of any apparent reason for [SSgt. Mosebach] to make a false allegation." *Id.* Based on these findings, Quality Assurance investigators weighed in with its concern that the "issue could have had (or could potentially have) adverse effects on patient safety and healthcare delivery." Dkt. 106-2 at 245.

### D. ORANG Discharge Board Substantiates Allegations and Recommends Discharge

On October 23, 2014, the ORANG Commander issued a Letter of Discharge recommending that ORANG discharge Plaintiff for his "pattern of misconduct, professional

4

dereliction, and substandard performance of duty." Dkt. 89-7 at 3. After a three-day evidentiary hearing in May 2015, an ORANG administrative separation board (ORANG Discharge Board) found that Plaintiff had been "derelict in the performance of his duties in…negligently fail[ing] to refrain from conducting a genital exam" on SSgt. Mosebach, "failed to document his performance of a genital exam…on a patient under his care," "inten[ded] to deceive" by making false statements about the event, and made "a false unsworn declaration" in which he "claimed that a [different] military investigation had unsubstantiated a sexual assault report, when, in fact, said investigation had substantiated the report." *Id.* at 1. The Board recommended that the Air Force discharge Plaintiff "under other than honorable conditions." *Id.* (cleaned up).

   E. Peer Review Panel Recommends Revocation of Plaintiff's Medical License

Based on the ORANG Discharge Board's recommendation, the Air Force convened a Peer Review Panel on November 8, 2015, to review Plaintiff's clinical performance. Dkt. 89-9 at 1. "The Panel agreed that this case did not suggest a simple breach of Standard of Care." *Id.* It found Plaintiff's actions to be "outside the scope of privileges for a physician working in a Guard Medical Unit (GMU), regardless of whether the act was in the best interest of the patient or was performed properly without complication." *Id.* The Panel concluded that Plaintiff's actions "demonstrated a breach of [patient] trust" and considered what action to take to best "ensure future patient safety." *Id.* Ultimately, the Panel determined that "action must be taken against Plaintiff's clinical privileges and due to the unethical nature of the allegation and concern for patient safety, the Panel was unable to recommend a reasonable level of restriction which would allow Plaintiff to continue practicing medicine within a GMU" of the Air Force. *Id.*

(cleaned up). Thus, "there was no recommendation to provide other than revocation of [Plaintiff's] clinical privileges." *Id.*[1]

But at this point, Plaintiff had moved to North Carolina to start his job at Womack Medical. Dkt. 89-1 at 7. Because he was no longer living or practicing in Oregon, an ORANG Medical Group Commander decided not to take any further action against Plaintiff. *Id.* at 10.

### F. Oregon Revokes Plaintiff's Medical License

On August 10, 2015, the Oregon Medical Board informed Plaintiff that it planned to revoke his Oregon Medical Board license. Dkt. 89-6 at 1. After a multi-day hearing, an administrative law judge issued a proposed order, finding that the Board proved by a preponderance of evidence that Plaintiff knowingly submitted a false declaration to a court of law. *Id.* at 3. The order also found that Plaintiff engaged in unprofessional conduct, including by "willfully" and "publicly" divulging a patient's confidential medical records. *Id.* It did not find, however, that the Board proved by a preponderance of the evidence that Plaintiff conducted an unauthorized gynecological exam.

On March 2, 2018, the Medical Board issued a final order adopting the proposed order and ordering the revocation of Plaintiff's Oregon medical license. *Id.* at 4. Plaintiff unsuccessfully appealed the Board's findings. *Id.* at 4. On June 28, 2018, the Medical Board revoked Plaintiff's Oregon medical license. *Id.* at 53.

---

[1] The Court refers to the Office of Complex Investigation's and the ORANG Discharge Board's conclusions together as "the ORANG Findings and Recommendation to Discharge." It refers to the Peer Review Panel's conclusions as the "Peer Review Findings and Recommendation to Revoke Privileges."

6

### G. Plaintiff's Opposition

In his opposition, Plaintiff makes two arguments but they conflict with each other. He first argues that he "did not conduct a pap test on anyone on November 19, 2011," the date of SSgt. Mosebach's exam. Dkt. 105-2 at 7. There is thus no note of the exam in SSgt. Mosebach's medical records because "Plaintiff's practice was not to document exams he did not conduct." *Id.*

Next, Plaintiff feigns ignorance. He argues that even if he had conducted the exam, it was because he "was negligently ignorant of a clinic rule concerning the scope of PHAs [periodic health assessments] at ORANG since 2004." Dkt. 106-3 at 2. According to Plaintiff, the ORANG base routinely included gynecological exams as part of periodic health assessments until 2004. *Id.* at 8. Sometime in or after 2004, the base "ceased including pap tests as part of PHAs," yet Plaintiff alleges that the base "did not have or create a written rule that prohibited pap tests from being included in PHAs." *Id.* Without a written policy, Plaintiff argues that he did not know "that pap tests were no longer part of ORANG's PHAs in 2011." Dkt. 106-1 at 17.

Essentially, Plaintiff says: I did not do it. But if I did do it, it is because I did not know I could not do it.

### H. Major Wong Informs Army of the Findings Against Plaintiff

In December 2015, the Air Force assigned then-Captain Crystal Wong[2] to help ORANG process a "clinical adverse action" against Plaintiff. Dkt. 89-10 at 1. In the Air Force, a clinical adverse action is an "action invoked against a healthcare provider, where authority to practice

---

[2] Crystal Wong has since received promotion to Major. The Court will refer to her by her current rank. The Court expresses its appreciation to SSgt. Mosebach, Maj. Wong, and other military declarants for their service to our country.

7

healthcare for the Air Force Medical Service is adversely affected." *Id.* Action is taken if the Air Force perceives a threat to patient safety, clinical incompetence, professional misconduct, or impairment. *Id.*

Maj. Wong, an active-duty Air Force judge advocate,[3] was well-qualified for the assignment. *Id.* During the time relevant here, Maj. Wong served in the Western Region as the Senior Medical Law Consultant and as the lead attorney advising the Air Force on clinical adverse actions. *Id.* She was also the subject matter expert in the field of medical law for Air Force installations in California and Washington. *Id.*

To recap, by the time Maj. Wong took on the case, ORANG, the ORANG Discharge Board, and an Air Force Peer Review Panel had each substantiated SSgt. Mosebach's allegations, found that Plaintiff interfered with investigators and harassed witnesses, and recommended discharge and revocation of his clinical privileges. After extensive work, on February 4, 2016, Maj. Wong provided the ORANG Commander and his team options on how to proceed. *Id*. at 3. The Commander "elected not to take any action because . . . [Plaintiff] was no longer seeing patients at [ORANG's] facility." *Id*.

Maj. Wong then asked the Commander if Plaintiff's new employer knew of the investigations into Plaintiff's misconduct. *Id*. She asked this question because "such information would normally be shared by the Commander with other facilities under [Air Force Instruction (AFI)] 44-119." *Id.* Specifically, the AFI provides that a medical treatment facility

---

[3] The Judge Advocate General's Corps predates the United States. Soon after becoming commander-in-chief of the Continental Army in 1775, General George Washington appointed the first Judge Advocate General and created an organization of lawyers dedicated to seeking justice within the military. Barbara Gersna, *Soldiers First, Lawyers Always*, Def. Visual Info. Distrib. Serv. (July 26, 2021), https://www.dvidshub.net/news/401697/soldiers-first-lawyers-always [https://perma.cc/L759-BD8X].

commander "will notify other MTFs or civil medical treatment facilities where the provider is practicing . . . when an abeyance or adverse action is initiated." *Id.* at n.3 (quoting AFI 9.15.2.1). Moreover, as an experienced lawyer in military medical law, she believed that the Department of Defense could face liability if Plaintiff "committed similar misconduct at another military medical treatment facility, when the Department of Defense knew of his prior misconduct." *Id*. at 3.  The Commander did not know the answer and the two agreed that Maj. Wong would contact Womack Medical.

On February 5, 2016, Maj. Wong held a call with the following Womack Medical employees: Alvin Wadsworth, the Deputy Center Counsel; David Chatham, a medical law attorney; and Jeffrey Drumm, the Chief of Credentials and Privileging.  *Id.*  These employees did not know of Plaintiff's disciplinary case.  *Id.*  Because she was concerned both for patient safety and for the Department of Defense's potential liability, Maj. Wong told Wadsworth, Chatham, and Drumm about the ORANG Discharge Board's Findings and Recommendation.  *Id.* at 4.  When asked for details of Plaintiff's misconduct, Maj. Wong relayed the ORANG Discharge Board proceeding's main findings.  *Id.*

When Maj. Wong made the disclosures, she understood that medical facilities commonly shared this type of information.  *Id.*  She shared it "to inform another branch of the Department of Defense that one of their providers had been accused of performing an unauthorized pap smear, which is a patient safety issue."  *Id.*  Maj. Wong had no intent to violate the Privacy Act in relaying this information.  *Id.*

## II.   STANDARD OF REVIEW

A court should grant summary judgment if "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A

9

fact is material if it can affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if there is evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citation and quotation marks omitted).

The moving party bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Though the Court should draw "all justifiable inferences" in favor of the non-moving party, "the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011). The Court must grant summary judgment when the non-moving party presents no "evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Here Plaintiff and Defendant have cross-moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Dkts. 89 and 106. In this situation, "each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Howard Town Ctr. Dev., LLC v. Howard Univ.*, 267 F. Supp. 3d 229, 236 (D.D.C. 2017) (cleaned up).

### III.     ARGUMENT

#### A. Statutory Background

The Privacy Act aims to "protect the privacy of individuals identified in information systems maintained by Federal agencies." Pub. L. No. 93–579, § 2(a)(5), 88 Stat. 1896, 1896 (1974). To achieve this goal, "[t]he Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004). Congress has essentially given individuals the power "to participate in ensuring that [their federal agency] records are accurate and properly used." *Bartel v. FAA*, 725 F.2d 1403, 1407 (D.C. Cir. 1984).

"The [Privacy] Act attempts to strike a balance between an individual's interest in correcting inaccurate information and the burdens placed on agencies in locating such information." *McCready v. Nicholson*, 465 F.3d 1, 8 (D.C. Cir. 2006). And "[t]o do so, it imposes a series of substantive and procedural obligations on federal agencies regarding records they maintain while simultaneously limiting what records are subject to the Act." *Id.*

Plaintiff originally sued under numerous provisions of the Act, but now pursues his suit only under 5 U.S.C. § 552a(g). *See* Dkt. 112 at 2. To prevail under this subsection, Plaintiff must prove that: "(1) the disclosed information is a record contained within a system of records; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff." *Reed v. Dep't of Navy*, 910 F. Supp. 2d 32, 40 (D.D.C. 2012) (cleaned up). "The burden of proof" on each of the four required elements "lies with the plaintiff." *Doe v. Dep't of Just.*, 660 F. Supp. 2d 31, 44 (D.D.C. 2009).

A disclosure is not improper if it falls within any of the exceptions in § 552a(b). 5 U.S.C. § 552a(b)(1)-(12). Relevant here, agencies can disclose on a need to know basis, *see id.* § 552a(b)(1), and "for a routine use," *id.* § 552a(b)(3).

**B. Major Wong's Disclosure Fell Within the "Need to Know" § 552a(b) Exception.**

Plaintiff's claim that the Privacy Act applies flatlines on two unassailable points: (1) the Air Force and Army are subagencies of the Department of Defense; and (2) a medical center needs to know if an employee doctor has been found to have assaulted a patient, and was recommended for discharge. And, rather sensibly, the Privacy Act exempts *intra-agency* disclosure to employees who *need to know* the information. *See Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000). Though these two points should be self-evident, the Court addresses each below.

First, Plaintiff claims that Maj. Wong made the disclosure between two agencies—the Air Force and the Army. *See* Dkt. 106-1 at 28–31. But both are part of the Department of Defense. *See* 10 U.S.C. § 101(a)(6). The Privacy Act contemplates that an executive department, such as the Department of Defense, is an agency for purposes of its coverage. 5 U.S.C. § 552a(f)(1); *cf. Bigelow*, 217 F.3d at 877. Thus, Maj. Wong made her disclosure within an agency and therefore, is exempt from the Act.

Second, Plaintiff argues that Womack Medical did not need to know of the Board's conclusions because neither his actions nor the Board's findings indicated any concern for patient safety. *See* Dkt. 106-1 at 36. That contention borders on the absurd. The ORANG Office of Complex Investigations found that SSgt. Mosebach's report of sexual assault was "substantiated based on a preponderance of the evidence." Dkt. 89-8 at 1. Based on that finding, Quality Assurance at ORANG was concerned that the "issue could have had (or could potentially

12

have) adverse effects on patient safety and healthcare delivery." Dkt. 106-2 at 245. The ORANG Discharge Board found that Plaintiff had been "derelict in the performance of his duties in…negligently fail[ing] to refrain from conducting a genital exam" on SSgt. Mosebach. Dkt. 89-7 at 1. And the Peer Review Panel "agreed that this case did not suggest a simple breach of Standard of Care." *Id.* In fact, "[d]ue to the unethical nature of the allegation and concern for patient safety, the Panel was unable to recommend a reasonable level of restriction which would allow . . . [Plaintiff] to continue practicing medicine within a [Guard Medical Unit] of the Air Force." Dkt. 89-9 at 1. Thus, "there was no recommendation to provide other than revocation of [Plaintiff's] clinical privileges." *Id.* The Oregon Medical Board ultimately revoked Plaintiff's medical license.

      Plaintiff's response is to ignore all of these findings and make three specious arguments. First, Plaintiff claims that he was not found to have committed "medical malpractice" and so the Army did not need to know about the investigations. Dkt. 106-1 at 37. But conduct need not rise to the level of medical malpractice to present a patient safety issue. And, in any event, the Peer Review Panel found that, at a minimum, he had acted negligently. Dkt. 89-9 at 1. Second, he argues that, because ORANG terminated its clinical adverse action against Defendant, clearly no patient safety concern existed. Dkt. 110 at 7. But by Plaintiff's own admission, ORANG terminated the process "because the Air Force determined that this process shouldn't have been used with a[n] Air National Guard facility." Tr. (Feb. 27, 2024) at 43. The termination did not reflect the charges against him. Finally, Plaintiff argues that Womack Medical did not need to know about the discharge proceedings because at the time of the disclosure, Plaintiff was a civilian. *Id.* at 42. But patient safety issue does not cease to be a patient safety issue because Plaintiff acts in his civilian, rather than his military, capacity.

## C. Major Wong Did Not Intend to Violate the Privacy Act

The Privacy Act is not a strict liability, or even negligence, statute. *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir.1984). The Act "imposes liability only when the agency acts in violation of the Act in a willful or intentional manner, either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." *Id.*

Maj. Wong has submitted an unrebutted declaration stating her intent. Dkt. 89-10. She says she made the disclosure "to inform another branch of the Department of Defense that one of their providers had been accused of performing an unauthorized pap smear, which is a patient safety issue." Dkt. 89-10 at 4. She believed that this information "was commonly shared between medical facilities in order to protect patients from potentially unsafe providers." *Id.* Maj. Wong also hoped that sharing the information would help the Department avoid liability if Plaintiff engaged in further misconduct. Dkt. 89-10 at 3. This is hardly "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (cleaned up).

Plaintiff asserts only that Maj. Wong willfully and intentionally violated the Act in making the disclosure because, as an attorney, she was "generally aware of the Privacy Act prior to her disclosure of Plaintiff's records" and because "Defendant present[ed] no evidence that [Maj.] Wong conducted *any* analysis to ensure that her disclosure was legal under the Act." Dkt. 110 at 10–11 (emphasis in original). This argument both seeks to shift the burden to Defendant to disprove a violation of the Act, and, even if accepted, at most would show that Maj. Wong negligently violated the Act. The Act does not countenance either approach. *See Maydak v. United States*, 630 F.3d 166, 180 (D.C. Cir. 2010).

14

### D. The Disclosure Did Not Cause Plaintiff's Injuries.

Plaintiff's actions, not Maj. Wong's disclosure, led to his being fired. To no surprise, Plaintiff does not provide evidence to support causation, which his claim requires. *See* 5 U.S.C. § 552a(g)(4); *Chao*, 540 U.S. at 619. He does not show that Maj. Wong's disclosure was the proximate cause of his injury, *see Dickson v. Off. of Pers. Mgmt.*, 828 F.2d 32, 37 (D.C. Cir. 1987), nor that it "was a substantial factor in the sequence of events leading to Plaintiff's injuries," *In re U.S. Off. of Pers. Mgmt. Data Breach Litig.*, 928 F.3d 42, 67 (D.C. Cir. 2019) (cleaned up). Instead, the sequence of events establishes that Womack Medical fired Plaintiff because Oregon had issued a notice that it planned to revoke his medical license.

Plaintiff's supervisor, the Chief of the Department of Anesthesia at Womack Medical, informed Plaintiff that Womack Medical was discharging him "because the Oregon State Medical Board issued a Complaint and Notice of Proposed Disciplinary Action." Dkt. 89-13 at 1. The Medical Board issued the complaint on February 26, 2016, and Plaintiff's supervisor informed him of his discharge on March 17, 2016. Dkt. 112 at 2. Indeed, these events occurred after Maj. Wong's February 5 phone call. Dkt. 89-13 at 1. But Plaintiff provides no evidence to rebut the stated reason for his discharge. Notably, Womack Medical did not discharge Plaintiff immediately upon learning of the disclosure but did do so soon after learning of the Medical Board's actions. The Medical Board ultimately did revoke Plaintiff's license on June 28, 2018. Dkt. 112 at 2.

In any event, Womack Medical would have learned of the ORANG Discharge Board's findings even absent the disclosure. The Health Care Quality Improvement Act of 1986 requires federal agencies to report "final adverse actions" against health care providers to a National Practitioner Data Bank. *See* 42 U.S.C. § 1320a-7e(b)(1). The Chief of Air Force Medical

15

Agency Operational Quality, in a signed and unrebutted declaration, stated that the "adverse action would have been a reportable event to the National Practitioner's Data Bank." Dkt. 112-1 at 2. Maj. Wong also highlighted that "[t]he discharge action itself is a mandatory report under federal law to the National Practitioner's Databank and something that Ft Bragg would have learned about the next time [Plaintiff] was up for a renewal of his privileges." Dkt. 89-17 at 2. And Drumm, Chief of Credentials and Privileges at Womack Medical and one of the individuals to whom Maj. Wong made the disclosure, agreed that the findings "probably would have hit . . . the database." Dkt. 112-2 at 4.

## IV.  CONCLUSION

There is a victim in all that occurred, but it was not the Plaintiff. His Privacy Act claim is without any merit whatsoever and the Court hereby:

**GRANTS** Defendant's Motion for Summary Judgment, Dkt. 89;

**DENIES** Plaintiff's Motion for Summary Judgment, Dkt. 106;

**DENIES** Plaintiff's Motion for Reconsideration, Dkt. 121;

**DISMISSES** Plaintiff's Complaint, Dkt. 1, and this case without prejudice; and

**DIRECTS** the Clerk of Court to close this case.

**SO ORDERED**.

This is a final appealable Order. *See* Fed. R. App. P. 4(a).

Date: October 15, 2025

_____
ANA C. REYES
United States District Judge